**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**F. SCOTT STUARD**
Frankfort, Indiana

ATTORNEYS FOR APPELLEE:

**CHARLES M. CROUSE, JR.**
Indiana Department of Child Services
Frankfort, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

**FILED**
Mar 09 2012, 9:38 am

CLERK
of the supreme court,
court of appeals and
tax court

| | | |
|---|---|---|
| A.V., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 12A01-1108-JT-409 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE CLINTON CIRCUIT COURT
The Honorable Linley E. Pearson, Judge
Cause Nos. 12C01-1103-JT-65, 12C01-1103-JT-66, 12C01-1103-JT-67 and 12C01-1103-JT-68

**March 9, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

A.V. ("Mother") appeals the involuntary termination of her parental rights to her children, claiming there is insufficient evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of D.R., born in October 2005, A.V., born in December 2006, J.R., born in March 2008, and S.V., born in March 2010.[1] The facts most favorable to the trial court's judgment reveal that in April 2010, the local Clinton County office of the Indiana Department of Child Services ("CCDCS") received a referral that Mother had left all four children, ranging in age from six-weeks-old to four years, at home with an eighteen-year-old babysitter for nearly one week with insufficient food and no contact information for Mother. The report further indicated that the babysitter, who was also caring for her own young child, had reported to Mother's landlord that she was overwhelmed, could no longer care for the children, and had called her own mother to "come and get her." Transcript at 22.

During an investigation of the matter, CCDCS assessment case manager Dawn Allen observed Mother's apartment to be dirty and lacking appropriate food and bedding for the children. Additionally, a search of the kitchen revealed there was only one-half of a can of formula in the home for S.V., which the babysitter stated she had purchased herself. After several attempts by both CCDCS and the apartment landlord to contact

---

[1] N.R. is the biological father of D.R., A.V., and J.R. E.S. is the biological father of S.V. E.S. voluntarily relinquished his parental rights to S.V. during the underlying proceedings. N.R.'s parental rights were involuntarily terminated by the trial court's July 2011 judgment. Neither father participates in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

2

Mother, the children were taken into emergency protective custody. Due to S.V.'s lethargy and non-responsiveness to verbal cues, the baby was taken to the emergency room to be evaluated. Doctors later determined S.V., who was born premature and had ongoing medical issues, was dehydrated. Additionally, this was not CCDCS's first encounter with the family, as Mother had been the subject of several substantiations of neglect by CCDCS dating back to 2005.

As a result of its assessment, CCDCS filed petitions alleging all four children were children in need of services ("CHINS"). Mother admitted to the allegations of the CHINS petitions in May 2010. Later the same month, CCDCS received several reports by the foster parents and service providers that the two older children had been observed engaging in "sexualized behaviors" such as kissing each other, "humping a tree," and stating they were "having sex." Id. at 63-64. Following a hearing in July 2010, the trial court issued a dispositional order formally removing all four children from Mother's custody and placing wardship of the children with CCDCS. The trial court's dispositional order further directed Mother to successfully complete a variety of tasks and services designed to approve her parenting abilities and to facilitate reunification of the family. Among other things, Mother was ordered to: (1) actively participate in home-based therapy; (2) engage in weekly home-based case management services pertaining to parenting, budgeting, and job search issues; (3) attend all scheduled supervised visits with the children; and (4) ensure that the current safety plan is complied with throughout the duration of the case.

3

During the next several months, Mother's participation in court-ordered reunification services was sporadic and ultimately unsuccessful. Although Mother demonstrated brief periods of improvement, she was unable to maintain her progress in services. For example, Mother's visitation privileges with the children initially progressed "pretty quickly" and by August 2010 had advanced to "semi-supervised" with some overnight visits occurring in early October 2010 in preparation for a trial home visit. Id. at 56, 61. During this time, however, Mother committed four violations of the safety plan put in place for the children, including an incident on October 20, 2010, where D.R. reported to the visit supervisor that Mother had allowed an unknown/unapproved male to spend the night in the family home while the children were visiting. As a result of these safety violations, the children's trial home visit was postponed and visits were returned to supervised office visits. A second trial home visit was thereafter scheduled to occur in January 2011, but it, too, never took place due to Mother's persistent inability to demonstrate she was capable of providing a safe and structured home atmosphere for the children. Of particular concern was an incident that occurred in January 2011 during which J.R. was observed by case manager Wells standing outside the family home on a "very cold day" "screaming with his hands out" while Mother stood on the front porch "yelling" at him to come inside. Id. at 84. D.R. and A.V. were also outside at the time, and all three children's "legs were soaked . . . from the snow in [their] sweat pants" and their hands were "so red." Id. at 85. Mother refused to gather the children, so Wells put the children in her care to warm them up before transporting them to their father for a visit. Approximately one week later, Mother

4

confided to one of the foster care case managers that she was overwhelmed with the care of all four children and felt like she was "about to have a nervous breakdown." Id. at 361.

In addition to Mother's inability to sustain her progress in visits with the children and repeated violations of the children's safety plans, which oftentimes involved Mother allowing unknown males to be in the family home during unsupervised visits with the children, Mother also was unable to maintain steady employment and housing. Specifically, although Mother obtained employment at Kentucky Fried Chicken in October 2010, she quit that job in March 2011 to take a factory job and then quit the factory job less than one week later. As for Mother's mental health issues, although testing revealed she "ranked in the severe level" for anxiety and depression, she discontinued taking her prescribed medications after only one week. Id. at 209.

CCDCS eventually filed petitions seeking the involuntary termination of Mother's parental rights to all four children in March 2011. A four-day evidentiary hearing was held in June 2011. During the termination hearing, CCDCS presented substantial evidence concerning Mother's failure to successfully complete a majority of the trial court's dispositional goals, including achieving employment and housing stability, cooperating with home-based service providers, taking her prescribed anxiety and depression medications, and demonstrating she is capable of providing the children with a safe and stable home environment. CCDCS also presented evidence establishing Mother's lengthy history of involvement with CCDCS, which includes multiple prior substantiations for neglect involving the children in 2010, 2009, and 2006 as well as a

substantiation against her in 2005 as a sexual perpetrator for having sex with one of the children's biological fathers, N.R., while N.R. was still underage. Regarding the children, CCDCS presented evidence showing that the children, who continued to struggle with significant emotional and behavior issues that were further exacerbated by the ongoing uncertainty in their lives, needed permanency and structure in order to thrive.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On July 15, 2011, the trial court entered its judgment terminating Mother's parental rights to all four children. Mother now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in terminating Mother's parental rights, the trial court entered specific factual findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly

6

erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

(C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2) (2010). The State's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). Moreover, Indiana Code section 31-35-2-8(b) provides that if a trial court does not find that the allegations in the termination petition are true, "the court *shall* dismiss the petition." Id. (Emphasis added). Although Mother admits on appeal that "the trial court's findings of fact are generally supported by the evidence," she nevertheless asserts that "there is a lack of evidence to draw the conclusions that the conditions would not be remedied or that continuation of the [parent-child] relationship posed a threat to the children" based on her progress in services at the time of the termination hearing. Appellant's Br. at 9. Mother therefore asserts she is entitled to reversal.

Initially, we observe that Indiana's termination statute provides that CCDCS need establish only one of the requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court may terminate parental rights. Because we find it to be dispositive under the facts of this particular case, we shall only consider whether clear and convincing evidence supports the trial court's findings regarding subsection (b)(2)(B)(i), namely, whether there is a reasonable probability the conditions resulting in the children's removal or continued placement outside the family home will be remedied.

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to

8

determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, CCDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, CCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

In the present case, the trial court's judgment contains numerous detailed findings regarding Mother's unresolved parenting issues. Specifically, the trial court noted Mother's lengthy history of involvement with CCDCS, including that Mother was "substantiated as a perpetrator for having sex with an under[-]aged [N.R.]" in 2005, and another substantiation in 2009 "against a teenage boy living in [Mother's] house for sexual molest against J.R." Appellant's App. at 113. The court further found that in addition to the "multitude of services" provided to the family, that case manager Wells also "attempted to find permanency and stability for the children by working on a number of plans suggested by [Mother]" and thereafter listed sixteen different living arrangements with various family members, fiancés, and/or friends, all of which were never able to be successfully instituted. Id. at 115. Additionally, the court detailed the

9

testimony of numerous case workers and service providers regarding Mother's overall lack of progress in services, acknowledging that although there were times during the CHINS case when Mother "would show some signs of promise, . . . the signs would not last as [Mother] became frustrated or received no cooperation from the fathers. . . ." Id. at 121. The court thereafter determined that "continuation of the parent-child relationship not only poses a threat to the wellbeing of D.R., A.V., J.R., and S.V., but that all services possible have been provided and that there is a reasonable probability that the conditions for placement outside the parents' homes will not be remedied." Id. at 121. A thorough review of the record leaves us satisfied that abundant evidence supports the trial court's findings cited above, which in turn support the court's ultimate decision to terminate Mother's parental rights to all four children.

The record makes clear that at the time of the termination hearing, Mother had made little, if any, progress in her ability to care for the children and to provide them with a safe and stable home environment. Specifically, Mother had been unemployed since March of 2011, was currently living with her own Father, and was still refusing to take her prescribed medications. Additionally, it was the general consensus among all case workers and service providers that Mother's situation would likely never improve. For example, case manager Wells testified that supervised visits with the children continued to be "chaotic," that Mother had been unsuccessfully discharged in September 2010 from individual counseling due to Mother's repeated refusal to show-up for scheduled appointments, and that she continued to deny needing any assistance. Transcript at 109. Wells also informed the court that although Mother had "somewhat" participated in

services, she had failed to "fully utiliz[e] them to her advantage." Id. at 95. Moreover, Wells confirmed that although Mother obviously loves her children, her ability to "provide a nurturing environment" for the children continued to be either limited or non-existent, and "as far as being able to provide . . . food, shelter, clothing on a long term basis without someone else to help her, there's no evidence of that." Id. Similarly, in recommending termination of Mother's parental rights, CCDCS supervisor Stacey Morgan testified that the trial court should not "wait until more damage is done to these children. It's been almost fourteen months and we're no closer to reunification than we were at the onset of this case." Id. at 248.

Similarly, home-based therapist Karen Hustedt-Warren testified that Mother had never acknowledged "any neglect on her part with the children," and had informed Hustedt-Warren on several occasions that "she felt like services were not beneficial." Id. at 173, 178. Also significant, in recommending termination of Mother's parental rights Guardian ad Litem Bradley Mohler characterized Mother's chances of being able to successfully provide the children with a safe and stable home as "pretty slim" and further stated that although there were times when Mother "showed signs of improvement," she simply was unable to "sustain" it. Id. at 647, 649.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged

11

conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Moreover, we have previously explained that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). Based on the foregoing, we conclude that clear and convincing evidence supports the trial court's findings as well as its ultimate determination to terminate Mother's parental rights. We therefore find no error.

Affirmed.

ROBB, C.J., and VAIDIK, J., concur.